FILED-USDC-NDTX-DA
'25 AUG 28 AM10:48

KM

IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF TEXAS

Dallas Division

|  |  |
|---|---|
| ) | 3-25CR-399-N |
| ) | \_\_\_\_\_-CR-\_\_\_\_\_ (\_\_\_\_\_) |
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | |
| KIMBERLY-CLARK CORPORATION, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |
| ) | |

## DEFERRED PROSECUTION AGREEMENT

The United States Department of Justice, Civil Division, Consumer Protection Branch and the United States Department of Justice, Criminal Division, Fraud Section (collectively, the "Offices"); and defendant Kimberly-Clark Corporation and its subsidiaries (the "Company"), pursuant to authority granted by the Company's Board of Directors reflected in Attachment B, enter into this deferred prosecution agreement (the "Agreement"). The terms and conditions of this Agreement are as follows:

### Criminal Information and Acceptance of Responsibility

1.      The Company acknowledges and agrees that the Offices will file the attached one count criminal Information in the United States District Court for the Northern District of Texas, charging the Company with a felony violation of the Food, Drug, and Cosmetic Act ("FDCA") for the introduction into interstate commerce a device that is adulterated in violation of Title 21 U.S.C. §§ 331(a), 333(a)(2), and 351(f)(1)(B). In so doing, the Company: (a) knowingly waives any right

1

it may have to indictment on this charge, as well as all rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) knowingly waives any objection with respect to venue to any charges by the United States arising out of the conduct described in the Statement of Facts attached hereto as Attachment A ("Statement of Facts") and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Northern District of Texas. The Offices agree to defer prosecution of the Company pursuant to the terms and conditions described below.

2.    The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts, and that the allegations described in the Information and the facts described in the Statement of Facts are true and accurate. The Company agrees that, effective as of the date the Company signs this Agreement, in any prosecution that is deferred by this Agreement, it will not dispute the Statement of Facts set forth in this Agreement, and, in any such prosecution, the Statement of Facts shall be admissible as: (a) substantive evidence offered by the government in its case-in-chief and rebuttal case; (b) impeachment evidence offered by the government on cross-examination; and (c) evidence at any sentencing hearing or other hearing. In addition, in connection therewith, the Company agrees not to assert any claim under the United States Constitution, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, Section 1B1.1(a) of the United States Sentencing Guidelines, or any other federal rule that the Statement of Facts should be suppressed or is otherwise inadmissible as evidence in any form.

2

## Term of the Agreement

3.      This Agreement is effective for a period beginning on the date on which the Information is filed (the "Effective Date") and ending twelve (12) months from that date (the "Term"). The Company agrees, however, that, in the event the Offices determine, in their sole discretion, that the Company has knowingly violated any provision of this Agreement or has failed to completely perform or fulfill each of the Company's obligations under this Agreement, an extension or extensions of the Term may be imposed by the Offices, in their sole discretion, for up to a total additional time period of one year, without prejudice to the Offices' right to proceed as provided in Paragraphs 31–34 below. Any extension of the Agreement extends all terms of this Agreement, including the terms of the reporting requirements in Attachment D, for an equivalent period. Conversely, in the event the Offices find, in their sole discretion, that there exists a change in circumstances sufficient to eliminate the need for the reporting requirements in Attachment D, and that the other provisions of this Agreement have been satisfied, the Agreement may be terminated early. If the Court refuses to grant exclusion of time under the Speedy Trial Act, Title 18, United States Code, Section 3161(h)(2), the Term shall be deemed to have not begun, and all provisions of this Agreement shall be deemed null and void, except: (a) the provisions contained within Paragraph 2 of this Agreement; and (b) the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts shall be tolled from the Effective Date of this Agreement until the date the Court refuses to grant the exclusion of time plus six months.

## Relevant Considerations

4.      The Offices enter into this Agreement based on the individual facts and circumstances presented by this case and the Company, including:

a.      the Company did not voluntarily and timely self-disclose to the Offices the conduct described in the Statement of Facts;

3

b.    the Company received full credit for its cooperation with the investigation conducted by the Offices, including timely providing all relevant facts to the Offices; meeting requests from the Offices promptly; making regular factual presentations and updates to the Offices; and producing extensive documentation to the Offices, including documents located in foreign jurisdictions;

c.    the Company provided to the Offices all relevant facts known to it, including information about the individuals involved in the conduct described in the Statement of Facts and conduct disclosed to the Offices prior to the Agreement, and the Company represents that it has timely and truthfully disclosed all factual information with respect to its activities, those of its subsidiaries and affiliates, and those of its present and former directors, officers, employees, agents, and consultants relating to the conduct described in this Agreement and the Statement of Facts, as well as any other conduct under investigation by the Offices about which the Company had any knowledge;

d.    the Company ceased manufacturing the surgical gowns at issue in this matter;

e.    the Company has enhanced and has committed to continuing to enhance its compliance program and internal controls, including ensuring that its compliance program is designed to prevent and detect violations of section 510(k) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 360(k)) and the implementing regulations in 21 CFR Part 807, Subpart E—Premarket Notification Procedures and successor regulations ("Relevant Law") and satisfies the minimum elements set forth in Attachment C to this Agreement ("Corporate Compliance Program");

4

f.      the Company has agreed to report to the Offices as set forth in Attachment D to this Agreement ("Compliance Reporting Requirements");

g.      based on the state of the Company's compliance program, the Company's agreement to report to the Offices as set forth in the Compliance Reporting Requirements, the Company's spinoff of its healthcare division in November 2014, its current sale of only two types of Class II medical devices with no anticipated 510(k) submissions, and the fact that the Company is no longer manufacturing or selling surgical gowns, the Offices have determined that a twelve (12) month term for this Agreement is appropriate;

h.      based on the state of the Company's compliance program, the Company's agreement to report to the Offices as set forth in the Compliance Reporting Requirements, the Company's spinoff of its healthcare division in November 2014, its current sale of only two types of Class II medical devices with no anticipated 510(k) submissions, and the fact that the Company is no longer manufacturing or selling surgical gowns, the Offices have determined that an independent compliance monitor is unnecessary;

i.      the nature and seriousness of the offense conduct, including distributing adulterated "MicroCool" surgical gowns;

j.      the Company has no history of similar misconduct; and

k.      the Company has agreed to continue to cooperate with the Offices in any ongoing investigation of the conduct of the Company, its subsidiaries and affiliates, and its current and former officers, directors, employees, agents, business partners, distributors, and consultants relating to violations of the FDCA;

l.      Accordingly, after considering (a) though (k) above, the Offices believe that the appropriate resolution in this case is a deferred prosecution agreement with the Company, a

5

monetary penalty of $24.5 million; a forfeiture payment of $3.9 million; a payment of victim compensation up to $12 million; and the Company's agreement to report to the Offices as set forth in the Compliance Reporting Requirements.

### Future Cooperation and Disclosure Requirements

5.    The Company shall cooperate fully with the Offices in any and all matters relating to the conduct described in this Agreement and the Statement of Facts and other conduct under investigation by the Offices at any time during the Term until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term. At the request of the Offices, the Company shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies in any investigation of the Company, its subsidiaries or affiliates, or any of its present or former officers, directors, employees, agents, and consultants, or any other party, in any and all matters relating to the conduct described in this Agreement and the Statement of Facts and other conduct under investigation by the Offices or any other component of the Department of Justice at any time during the Term. The Company's cooperation pursuant to this Paragraph is subject to applicable law and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Company must provide to the Offices a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Company bears the burden of establishing the validity of any such an assertion. The Company agrees that its cooperation pursuant to this Paragraph shall include, but not be limited to, the following:

a.    The Company shall truthfully disclose all factual information with respect to its activities, those of its subsidiaries and affiliates, and those of its present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Company has any knowledge or about which the Offices

6

may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company to provide to the Offices, upon request, any document, record, or other tangible evidence about which the Offices may inquire of the Company.

        b.     Upon request of the Offices, the Company shall designate knowledgeable employees, agents or attorneys to provide to the Offices the information and materials described in Paragraph 5.a above on behalf of the Company. It is further understood that the Company must at all times provide complete, truthful, and accurate information.

        c.     The Company shall use its best efforts to make available for interviews or testimony, as requested by the Offices, present or former officers, directors, employees, agents, and consultants of the Company. This obligation includes, but is not limited to, sworn testimony before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Company, may have material information regarding the matters under investigation.

        d.     With respect to any information, testimony, documents, records or other tangible evidence provided to the Offices pursuant to this Agreement, the Company consents to any and all disclosures to other governmental authorities, including United States authorities and those of a foreign government of such materials as the Offices, in their sole discretion, shall deem appropriate.

<b><u>Payment of Monetary Penalty</u></b>

        6.     The Company and the Offices agree that a penalty in the amount of $24.5 million (the "Criminal Monetary Penalty") is appropriate given the facts and circumstances of this case, including the Relevant Considerations described in Paragraph 4 of this Agreement. The Company agrees to pay the Criminal Monetary Penalty of $24.5 million to the U.S. Treasury no later than

ten (10) days (excluding Saturdays, Sundays, and legal public holidays identified in Title 5, United States Code, Section 6103(a)) (hereinafter, "business days") after the Effective Date of this Agreement in accordance with payment instructions provided by the Offices in their sole discretion.

7.    Payment of the Criminal Monetary Penalty is final and shall not be refunded. Furthermore, nothing in this Agreement shall be deemed an agreement by the Offices that the Criminal Monetary Penalty is the maximum penalty that may be imposed in any future prosecution, and the Offices are not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Offices agree that under those circumstances, the Offices will recommend to the Court that the Criminal Monetary Penalty paid by the Company pursuant to this Agreement be applied toward any fine that the Court might impose as part of its judgment. The Company acknowledges that such a recommendation will not be binding on the Court.

8.    The Company acknowledges that no tax deduction may be sought in connection with the payment of any part of the Criminal Monetary Penalty. The Company shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the penalty amounts that the Company pays pursuant to this Agreement concerning the facts set forth in the Statement of Facts.

**Forfeiture**

9.    The Company acknowledges that money and/or property is subject to forfeiture as a result of its violation of Title 21, United States Code, Sections 331(a) and 333(a)(2), as alleged in the Information. Pursuant to Title 18, United Sates Code, Section 981, the Company consents to the forfeiture of $3.9 million (the "Forfeiture Amount").

10.    The Company shall pay the Forfeiture Amount, plus any associated transfer fees, no later than ten (10) business days after the Effective Date of this Agreement in accordance with payment instructions provided by the Offices in their sole discretion. The Company hereby releases any and all claims that it may have to the Forfeiture Amount, agrees that the forfeiture of such funds may be accomplished either administratively or judicially at the Offices' election, and waives the requirements of any applicable laws, rules, or regulations governing the forfeiture of assets, including those requiring notice of forfeiture. If the Offices seek to forfeit the Forfeiture Amount judicially, the Company waives all requirements pertaining to forfeiture set forth in Title 18, United Sates Code, Section 983, including the filing of a civil forfeiture complaint as to the Forfeiture Amount and notice of the same, and consents to entry of an order of forfeiture directed to such funds. If the Offices seek to forfeit the Forfeiture Amount administratively, the Company consents to the entry of a declaration of forfeiture and waives the requirements of Title 18, United States Code, Section 983 regarding notice of seizure in non-judicial forfeiture matters.

11.    The Company agrees to sign any additional documents necessary to complete forfeiture of the Forfeiture Amount. The Company also agrees that it shall not file any petitions for remission, restoration, or any other assertion of ownership or request for return relating to the Forfeiture Amount, or any other action or motion seeking to collaterally attack the seizure, restraint, forfeiture, or conveyance of the Forfeiture Amount, nor shall it assist any others in filing any such claims, petitions, actions, or motions.

12.    Payment of the Forfeiture Amount is final and shall not be refunded. Furthermore, nothing in this Agreement shall be deemed an agreement by the Offices that the Forfeiture Amount is the maximum forfeiture that may be imposed in any future prosecution, and the Offices are not precluded from arguing in any future prosecution that the Court should impose a higher forfeiture,

9

although the Offices agree that under those circumstances, the Offices will recommend to the Court that the Criminal Forfeiture Amount paid by the Company pursuant to this Agreement be applied toward any forfeiture that the Court might impose as part of its judgment. The Company acknowledges that such a recommendation will not be binding on the Court.

13.    The Company acknowledges that it shall not claim, assert, or apply for, either directly or indirectly, any tax deduction, tax credit, or any other offset with regard to any U.S. federal, state, or local tax or taxable income in connection with the payment of any part of the Forfeiture Amount. The Company shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source with regard to the Forfeiture Amount that the Company pays pursuant to the Agreement.

## Payment of Victim Compensation

14.    The Company agrees to pay Victim Compensation, up to twelve (12) million dollars in total, to individuals and organizations who were directly and proximately harmed by a defect (for example, strikethrough from a sleeve seam failure) in a MicroCool gown manufactured and sold between October 1, 2013 and October 31, 2014 (hereinafter "Victim" or "Victims"). A MicroCool surgical gown being manufactured and sold between October 1, 2013 and October 31, 2014, or the purchase or mere use of such a gown, does not by itself constitute evidence of a defect in the gown, or constitute such direct and proximate harm as described in this paragraph.

15.    The parties agree that the appointment of a Victim Compensation Claims Administrator (the "Administrator") is appropriate and necessary to determine the proper administration and disbursement of Victim Compensation that the Company will pay to Victims.

16.    The Administrator will make recommendations to the Offices and notify the Company regarding who qualifies as a Victim (within the definition and parameters of Paragraph 14) eligible to receive Victim Compensation and the compensation amount that the Victim should

receive.  In making its recommendations to the Offices, the Administrator shall use a process imposed and required by the Offices which will include a requirement for documentation showing that each claimant meets the definition of Victim.  Only the Offices shall be empowered to make final decisions regarding who qualifies as a Victim eligible to receive Victim Compensation and the compensation amount that the Victim should receive.

   17. The amount of Victim Compensation shall be limited to pecuniary loss, shall be consistent with 18 U.S.C. § 3663(b)(1)-(4), and shall not include attorney's fees or other legal costs unrelated to participation in the government's investigation or criminal prosecution.

   18. The Company agrees to pay for all costs, fees, and expenses incurred by the Administrator pursuant to the terms of an engagement letter with the Administrator that must be approved, in advance of execution, by the Company and the Offices.

   19. Within twenty (20) business days after the Effective Date of this Agreement, the Company shall submit to the Offices a written proposal identifying three (3) candidates to serve as the Administrator, setting forth the candidates' qualifications and credentials. The Offices retain the right, in their sole discretion, to choose the Administrator from among the candidates proposed by the Company.  Any submission or selection of an administrator candidate by either the Company or the Offices shall be made without unlawful discrimination against any person or class of persons. The Offices and the Company will use their best efforts to complete the selection process within thirty (30) business days after the Effective Date of this Agreement.

   20. The Company agrees that it will not employ or be affiliated with the Administrator for a period of not less than two (2) years from the date on which the Term of this Agreement expires, nor will the Company discuss with the Administrator the possibility of further employment or affiliation during the Term of this Agreement. Upon agreement by the parties, this

11

prohibition will not apply to other claims administration responsibilities that the Administrator may undertake in connection with resolutions with foreign or other domestic authorities.

21.     Within five (5) business days of the Administrator being selected, the Company shall provide the Administrator with all available information to identify potential Victims as described in Paragraph 14, including a list of purchasers.

22.     The Administrator shall establish a process to notify potential Victims of the process and procedure for submitting a claim for Victim Compensation and the documentation necessary for Victim Compensation. The Administrator shall provide an initial notice sixty (60) calendar days after the Effective Date of this Agreement or thirty (30) calendar days after the Administrator is selected, whichever is later, and a follow-up notice sixty (60) calendar days later.

23.     Any individual or entity who believes they are a Victim entitled to Victim Compensation must submit a claim and necessary documentation to the Administrator within four (4) months of the Administrator's initial notice described in Paragraph 22, pursuant to the process and procedure outlined by the Administrator in the notice.

24.     The Offices will notify the Company of the total aggregate amount of Victim Compensation it must pay within eight (8) months of the Administrator's initial notice described in Paragraph 22. The Company must pay that amount of Victim Compensation within sixty (60) calendar days following the Offices' notification of the total amount of Victim Compensation. The Company shall pay no more than twelve (12) million dollars, in the aggregate to all Victims, in Victim Compensation.

### Conditional Release from Liability

25.     Subject to Paragraphs 31–34, the Offices agree, except as provided in this Agreement, that they will not bring any criminal case against the Company relating to any of the conduct described in the Statement of Facts or the Information filed pursuant to this Agreement.

12

The Offices, however, may use any information related to the conduct described in the Statement of Facts against the Company: (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

a.      This Agreement does not provide any protection against prosecution for any future conduct by the Company.

b.      In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Company.

### Corporate Compliance Program

26.     The Company represents that it has implemented and will continue to implement a compliance and ethics program designed to prevent and detect violations of Relevant Law, throughout its operations, including those of its subsidiaries, affiliates, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities relate to interactions with domestic government agencies (including the Food and Drug Administration ("FDA")) and the Company's manufacture, marketing, sale, and distribution of FDA-regulated products, including, but not limited to, the minimum elements set forth in Attachment C.

27.     In order to address any deficiencies in its internal controls, policies, and procedures, the Company represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal controls, policies, and procedures regarding compliance with the Relevant Law. Where necessary and appropriate, the Company agrees to adopt a new compliance program, or to modify its existing one, including internal controls, compliance policies, and procedures in order to ensure that it maintains an effective compliance program, including a system of internal controls, designed to

effectively detect and deter violations of Relevant Law. The compliance program, including the internal controls system will include, but not be limited to, the minimum elements set forth in Attachment C.

<b>Corporate Compliance Reporting</b>

28.      The Company agrees that it will report to the Offices periodically during the Term regarding remediation and implementation of the compliance measures described in Attachment C. These reports will be prepared in accordance with Attachment D.

<b>Deferred Prosecution</b>

29.      In consideration of the undertakings agreed to by the Company herein, the Offices agree that any prosecution of the Company for the conduct set forth in the Statement of Facts be and hereby is deferred for the Term. To the extent there is conduct disclosed by the Company that is not set forth in the Statement of Facts, such conduct will not be exempt from further prosecution and is not within the scope of or relevant to this Agreement.

30.      The Offices further agree that if the Company fully complies with all of its obligations under this Agreement, the Offices will not continue the criminal prosecution against the Company described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire, except as described in the last sentence of this Paragraph. Within three (3) months after the Agreement's expiration, the Offices shall seek dismissal with prejudice of the Information filed against the Company described in Paragraph 1, and agree not to file charges in the future against the Company based on the conduct described in this Agreement and the Statement of Facts. If, however, the Offices determine during this three-month period that the Company breached the Agreement during the Term, as described in Paragraph 31, the Offices' ability to extend the Term, as described in Paragraph 3, or to pursue other remedies, including those described in Paragraphs 31-34 remains in full effect.

14

**Breach of the Agreement**

31.    If, during the Term, the Company (a) commits any felony under U.S. federal law; (b) provides in connection with this Agreement deliberately false, incomplete, or misleading information, including in connection with its disclosure of information about individual culpability; (c) fails to cooperate as set forth in Paragraph 5 of this Agreement; (d) fails to make any payment as required by this Agreement; (e) fails to implement a compliance program as set forth in Paragraphs 26-27 of this Agreement and Attachment C; (f) fails to make any reports as set forth in Paragraph 28 of this Agreement and Attachment D; or (g) otherwise fails to completely perform or fulfill each of the Company's obligations under the Agreement, regardless of whether the Offices become aware of such a breach after the Term is complete, the Company shall thereafter be subject to prosecution for any federal criminal violation of which the Offices have knowledge, including, but not limited to, the charge in the Information described in Paragraph 1, which may be pursued by the Offices in the U.S. District Court for the Northern District of Texas or any other appropriate venue. Determination of whether the Company has breached the Agreement and whether to pursue prosecution of the Company shall be in the Offices' sole discretion. Any such prosecution may be premised on information provided by the Company or its personnel. Any such prosecution relating to the conduct described in the Statement of Facts or relating to conduct known to the Offices prior to the Effective Date of this Agreement that is not time-barred by the applicable statute of limitations on the Effective Date of this Agreement may be commenced against the Company, notwithstanding the expiration of the statute of limitations, between the Effective Date and the expiration of the Term plus one year. Thus, by signing this Agreement, the Company agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the Effective Date of this Agreement shall be tolled for the Term plus one year. In addition, the Company agrees that the statute of limitations as to any violation of U.S.

15

federal law that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Offices are made aware of the violation or the duration of the Term plus five years, and that this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

32.     In the event the Offices determine that the Company has breached this Agreement, the Offices agree to provide the Company with written notice of such breach prior to instituting any prosecution resulting from such breach. Within thirty (30) calendar days of receipt of such notice, the Company shall have the opportunity to respond to the Offices in writing to explain the nature and circumstances of such breach, as well as the actions the Company has taken to address and remediate the situation, which explanation the Offices shall consider in determining whether to pursue prosecution of the Company.

33.     In the event that the Offices determine that the Company has breached this Agreement: (a) all statements made by or on behalf of the Company to the Offices or to the Court, including the Statement of Facts, and any testimony given by the Company before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Offices against the Company; and (b) the Company shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that any such statements or testimony made by or on behalf of the Company prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer, or employee, or any person acting on behalf of, or at the direction of, the Company, will be imputed to the Company

16

for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the Offices.

34.    The Company acknowledges that the Offices have made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company breaches this Agreement and this matter proceeds to judgment. The Company further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

**Sale, Merger, or Other Change in Corporate Form of Company**

35.    Except as may otherwise be agreed by the parties in connection with a particular transaction, the Company agrees that in the event that, during the Term, it undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Company's operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the Statement of Facts, as they exist as of the Effective Date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the Offices' ability to determine a breach under this Agreement is applicable in full force to that entity. The Company agrees that the failure to include these provisions in the transaction will make any such transaction null and void. The Company shall provide notice to the Offices at least thirty (30) business days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The Offices shall notify the Company prior to such transaction (or series of transactions) if they determine that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement. If at any time during the Term the

Company engages in a transaction that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Offices may deem it a breach of this Agreement pursuant to Paragraph 31 of this Agreement. Nothing herein shall restrict the Company from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Offices.

### Public Statements by Company

36.     The Company expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents or any other person authorized to speak for the Company make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the Statement of Facts. Any such contradictory statement shall, subject to cure rights of the Company described below, constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution as set forth in Paragraphs 31-34 of this Agreement. The decision whether any public statement by any such person contradicting a fact contained in the Statement of Facts will be imputed to the Company for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Offices. If the Offices determine that a public statement by any such person contradicts in whole or in part a statement contained in the Statement of Facts, the Offices shall so notify the Company, and the Company may avoid a breach of this Agreement by publicly repudiating such statement(s) within five (5) business days after notification. The Company shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the Statement of Facts. This Paragraph does not apply

18

to any statement made by any present or former officer, director, employee, or agent of the Company in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Company.

37.     The Company agrees that if it, or any of its direct or indirect subsidiaries or affiliates issues a press release or holds any press conference in connection with this Agreement, the Company shall first consult with the Offices to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Offices and the Company; and (b) whether the Offices have any objection to the release.

38.     The Offices agree, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and remediation. By agreeing to provide this information to such authorities, the Offices are not agreeing to advocate on behalf of the Company but rather are agreeing to provide facts to be evaluated independently by such authorities.

### Limitations on Binding Effect of Agreement

39.     This Agreement is binding on the Company and the Offices but specifically does not bind any other component of the Department of Justice, other federal agencies, or any state, local, or foreign law enforcement or regulatory agencies, or any other authorities, although the Offices will bring the cooperation of the Company and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company.

### Notice

40.     Unless otherwise directed by the Offices in writing, any notice to the Offices under this Agreement shall be given by electronic mail to Consumer.Compliance@usdoj.gov and to any

additional email addresses provided by the Offices. The subject line of the email must begin with the Company's name. In the event that electronic mail is unavailable, the notice may be sent by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail to an address provided by the Offices. Notice shall be effective upon actual receipt by the Offices.

41.     Any notice to the Company under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Office of the General Counsel, Kimberly-Clark Corp., 351 Phelps Drive, Irving, TX 75038, and by electronic mail to that individual or to other counsel or individuals identified to the Offices by the Company. Notice shall be effective upon actual receipt by the Company.

### Complete Agreement

42.     This Agreement, including its attachments, sets forth all the terms of the agreement between the Company and the Offices. No amendments, modifications, or additions to this Agreement shall be valid unless they are in writing and signed by the Offices, the attorneys for the Company, and a duly authorized representative of the Company.

*       *       *

20

**AGREED:**

**FOR KIMBERLY-CLARK CORPORATION:**

Date: August 27, 2025          By: _____

Grant B. McGee
Senior Vice President, General Counsel
Kimberly-Clark Corporation

Date: _____          By: _____

Steven E. Fagell
Matthew J. O'Connor
Covington & Burling LLP

21

**AGREED:**

**FOR KIMBERLY-CLARK CORPORATION:**

Date: _____          By: _____

                                       Grant B. McGee
                                       Senior Vice President, General Counsel
                                       Kimberly-Clark Corporation

Date: 8/27/2025          By: _____

                                       Steven E. Fagell
                                       Matthew J. O'Connor
                                        Covington & Burling LLP

**FOR THE DEPARTMENT OF JUSTICE:**

LISA K. HSIAO
Acting Director
Consumer Protection Branch
United States Department of Justice

Date: ___8 /2 7/2025___            By: _____
                                        David L. Gunn
                                        Senior Trial Attorney

                                        Max Goldman
                                        Amanda Kelly
                                        Trial Attorneys

                                        LORINDA LARYEA
                                        Acting Chief
                                        Fraud Section, Criminal Division
                                        United States Department of Justice

Date: ___8/2 7/2025___            By: _____
                                        Jacob Foster
                                        Principal Assistant Chief

22

## COMPANY OFFICER'S CERTIFICATE

I have read this Agreement and carefully reviewed every part of it with outside counsel for Kimberly-Clark Corporation (the "Company"). I understand the terms of this Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing this Agreement, I consulted outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

I have carefully reviewed the terms of this Agreement with the Board of Directors of the Company. I have advised and caused outside counsel for the Company to advise the Board of Directors fully of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in this Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing this Agreement on behalf of the Company, in any way to enter into this Agreement. I am also satisfied with outside counsel's representation in this matter. I certify that I am the Senior Vice President, General Counsel of the Company and that I have been duly authorized by the Company to execute this Agreement on behalf of the Company.

Date: __8|27/2025__                    By: _____

Grant B. McGee
Senior Vice President, General Counsel
Kimberly-Clark Corporation

23

## CERTIFICATE OF COUNSEL

I am counsel for Kimberly-Clark Corporation (the "Company") in the matter covered by this Agreement. In connection with such representation, I have examined relevant Company documents and have discussed the terms of this Agreement with the Company Board of Directors. Based on our review of the foregoing materials and discussions. I am of the opinion that the representative of the Company has been duly authorized to enter into this Agreement on behalf of the Company and that this Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company. Further, I have carefully reviewed the terms of this Agreement with the Board of Directors and the Senior Vice President, General Counsel of the Company. I have fully advised them of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement. To my knowledge, the decision of the Company to enter into this Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: **8/27/2025**          By: _Steven E. Fagell_

Steven E. Fagell
Matthew J. O'Connor
Covington & Burling LLP
Counsel for Kimberly-Clark Corporation

ATTACHMENT A

**STATEMENT OF FACTS**

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Department of Justice, Consumer Protection Branch and the United States Department of Justice, Criminal Division, Fraud Section (collectively, the "Offices") and defendant Kimberly-Clark Corporation ("Kimberly-Clark" or the "Company"). Kimberly-Clark hereby agrees and stipulates that the following information is true and accurate. Kimberly-Clark admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below. Should the Offices pursue the prosecution that is deferred by this Agreement, Kimberly-Clark agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The following facts took place in or about and between August 2013 and October 31, 2014 (the "Relevant Time Period"), unless otherwise noted, and Kimberly-Clark agrees that these facts establish beyond a reasonable doubt the charge set forth in the Information attached to this Agreement.

**Relevant Individuals and Entities**

1.      Kimberly-Clark Corporation is a U.S.-based multinational corporation that engaged in, among other things, the design, manufacture, and sale of medical devices, including MicroCool disposable surgical gowns, beginning as early as 1998 until November 1, 2014, when Kimberly-Clark's healthcare division was spun off and became a standalone company, Halyard Health, Inc. ("Halyard Health"). Prior to the spin-off, Kimberly-Clark marketed and sold such surgical gowns directly to hospitals and other health care providers (and through third-party distribution channels) throughout the United States and abroad.

A-1

2.     Employee 1 was employed as a scientist in the Research and Engineering department of Kimberly-Clark from approximately October 2004 until October 2014, including during the Relevant Time Period for this Statement of Facts.

### AAMI Level 4 Standard

3.     In the United States, surgical gowns are subject to regulation by the United States Food and Drug Administration ("FDA"), the federal agency responsible for protecting the health and safety of the American public by enforcing the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.* ("FDCA").

4.     In or about 2004, FDA recognized the American National Standards Institute ("ANSI") and Association for the Advancement of Medical Instrumentation ("AAMI") system of classification for surgical gowns, known as the "ANSI/AAMI PB70 standard." The ANSI/AAMI PB70 standard, first established in or about 2003, described the barrier protection levels (ranging from 1 to 4) of surgical gowns and specified the testing necessary to verify each level of protection.

5.     Under the ANSI/AAMI PB70 standard, the highest protection level for surgical gowns — "AAMI Level 4"— was reserved for gowns intended for surgeries and other high risk medical procedures on patients suspected of having infectious diseases. Level 4 surgical gowns were intended to protect both health care workers and patients from potential blood-borne pathogens and exposure to such diseases.

6.     To qualify for an AAMI Level 4 rating under the ANSI/AAMI PB70 standard, a surgical gown needed to pass certain tests conducted on all critical zones — the areas on a surgical gown where direct contact with blood, body fluids, and other potentially infectious materials were mostly likely to occur. To establish compliance with the standard, a surgical gown needed to

demonstrate blood-borne pathogen resistance in each of those zones by preventing fluids from penetrating the gown. The sleeve was a critical zone on surgical gowns.

### MicroCool Surgical Gowns

7.    Kimberly-Clark developed the "MicroCool Breathable High-Performance Surgical Gown" (hereinafter, "MicroCool gown") as "sterile, single use surgical apparel intended to be worn by healthcare professionals to help protect both the patient and the healthcare worker from the transfer of microorganisms, body fluids, and particulate matter."

8.    On or about December 23, 2010, FDA cleared a "premarket notification," or "510(k)," allowing Kimberly-Clark to legally market and sell MicroCool gowns as AAMI Level 4 gowns. Pursuant to FDA regulations, however, Kimberly-Clark was required to ensure its claims that the MicroCool gowns complied with the requirements of AAMI Level 4 in the 2003 ANSI/AAMI PB70 standard were accurate.

9.    Employee 1 contributed to the development of the MicroCool gown and served as a technical leader on the gown's construction and features at Kimberly-Clark. In that role, Employee 1 participated in efforts to improve the MicroCool gown's performance and profitability, worked closely with Honduras plant workers on sampling and testing the gowns, provided MicroCool data and information to Kimberly-Clark's marketing and sales divisions, in certain circumstances, and acted as a Company representative to certain hospital customers by providing assurances about the MicroCool gown's compliance and protection level.

**Employee 1 Fraudulently Manipulated Sleeve-Seam Testing to Avoid Kimberly-Clark Needing to File a New 510(k) with FDA**

10.     In or around August 2013, Kimberly-Clark made the decision to change the fabric of the MicroCool gowns, removing a substance called ethylene-vinyl acetate ("EVA") from the fabric.

11.     Subject to certain exceptions that are inapplicable to this matter, a manufacturer of a medical device currently in commercial distribution or being reintroduced into commercial distribution is required to submit a "premarket notification" to FDA, or "510(k)," if the device is about to undergo a change or modification that could significantly affect the safety or effectiveness of the device, for example, a significant change or modification in design, material, chemical composition, energy source, or manufacturing process, so that FDA can clear the device for commercial distribution.

12.     In or around August 2013, Kimberly-Clark tasked Employee 1 with testing the new, "non-EVA" MicroCool gowns to determine whether the removal of EVA from the MicroCool fabric significantly affected the gowns' safety or efficacy (the "EVA Testing"). The EVA Testing was aimed at determining whether the new, non-EVA MicroCool gowns met the AAMI Level 4 requirements. If the new, non-EVA MicroCool gowns passed the EVA Testing, Kimberly-Clark would not be required to file a new 510(k) with FDA for the non-EVA MicroCool gowns.

13.     With an intent to defraud and mislead, and so Kimberly-Clark could avoid filing a 510(k) for the non-EVA MicroCool gowns, Employee 1 directed the preparation of test samples for the EVA Testing that did not meet the requirements of AAMI Level 4 testing.

14.     Reliable AAMI Level 4 testing requires "randomization" and enough samples to achieve a statistically significant result.  Randomization requires testing of gowns representative of the gowns being produced and sold to customers.

A-4

15.   In preparation for the EVA Testing, Employee 1 directed another Kimberly-Clark employee to pre-test the sleeve seams of non-EVA MicroCool gowns. Employee 1 then used only 10 sleeves of selected MicroCool gowns for the EVA Testing.

16.   Employee 1 also directed another Kimberly-Clark employee to cut 50 test samples for the EVA Testing from only the 10 sleeves of selected MicroCool gowns, rather than from 50 randomly selected MicroCool gowns. Employee 1 did so to make it appear that Employee 1 was testing enough gowns to achieve a statistically significant sample, when in truth and fact the samples only came from 10 sleeves of selected MicroCool gowns.

17.   On or about September 9, 2013, a testing company (the "Testing Company") received from Kimberly-Clark for viral-penetration testing the 50 test samples of non-EVA bar-sealed MicroCool sleeve seams. On or about September 23, 2013, the Testing Company issued its test report for its viral-penetration testing of the 50 test samples of non-EVA bar-sealed MicroCool sleeve seams (the "Fraudulent MicroCool Test Report"). The Fraudulent MicroCool Test Report showed that 49 of the 50 test samples of non-EVA bar-sealed MicroCool sleeve seams that Employee 1, as described previously, fraudulently prepared passed the Testing Company's viral-penetration testing, thus making it appear that the non-EVA MicroCool gowns complied with AAMI Level 4 requirements.

18.   Relying on Employee 1 and the Fraudulent MicroCool Test Report he oversaw, Kimberly-Clark did not submit a 510(k) to FDA for the removal of EVA from the fabric used to make MicroCool gowns.

19.   Relying on Employee 1 and the Fraudulent MicroCool Test Report he oversaw, Kimberly-Clark manufactured and sold MicroCool gowns with non-EVA fabric from on or about

A-5

October 1, 2013, and continuing through on or about October 31, 2014, without submitting a 510(k) to FDA for the removal of EVA from the fabric used to make MicroCool gowns.

20.    By conducting the fraudulent EVA Testing to get passing results and avoid filing a new 510(k) for the non-EVA MicroCool gowns, Employee 1, with an intent to defraud and mislead, introduced and caused the introduction into interstate commerce of adulterated Kimberly-Clark MicroCool gowns made with non-EVA fabric from on or about October 1, 2013, when the EVA was taken out of the fabric, until on or about October 31, 2014, when Kimberly-Clark stopped making MicroCool gowns as a result of its healthcare division being spun off as a separate, publicly-traded company, Halyard Health.

### Kimberly-Clark, through Employee 1, Introduced Adulterated MicroCool Surgical Gowns into Interstate Commerce with the Intent to Defraud and Mislead

21.    From on or about October 1, 2013, and continuing through on or about October 31, 2014, Kimberly-Clark, through Employee 1, with the intent to defraud and mislead, knowingly introduced and caused the introduction into interstate commerce medical devices, namely MicroCool surgical gowns, that were adulterated within the meaning of Title 21, United States Code, Sections §§ 331(a), 333(a)(2), and 351(f)(1)(B).

22.    At all times relevant to this Statement of Facts, Employee 1 was acting within the scope of his employment and with the intention, at least in part, to benefit Kimberly-Clark.

23.    From on or about October 1, 2013, and continuing through on or about October 31, 2014, Kimberly-Clark sold approximately $49 million worth of adulterated MicroCool gowns to customers across the United States.

ATTACHMENT B

**CERTIFICATE OF CORPORATE RESOLUTIONS**

WHEREAS, Kimberly-Clark Corporation (the "Company") has been engaged in discussions with the United States Department of Justice, Consumer Protection Branch and the United States Department of Justice, Criminal Division, Fraud Section (collectively, the "Offices") regarding issues arising in relation to violations of the Federal Food, Drug, and Cosmetic Act ("FDCA"); and

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a certain agreement with the Offices; and

WHEREAS, the Company's Senior Vice President, General Counsel, Grant B. McGee, together with outside counsel for the Company, have advised the Board of Directors of the Company of its rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into such agreement with the Offices;

Therefore, the Board of Directors has RESOLVED that:

1.      The Company (a) acknowledges the filing of the one-count Information charging the Company with a felony violation of the FDCA, namely the introduction into interstate commerce of a medical device that is adulterated, in violation of Title 21 U.S.C. §§ 331(a), 333(a)(2), and 351(f)(1)(B); (b) waives any right it might have to indictment on such charge and enters into a Deferred Prosecution Agreement (the "Agreement") with the Offices; and (c) agrees to accept a monetary penalty and forfeiture against the Company totaling $28.4 million and to pay up to $12 million in victim compensation, and to pay such amounts with respect to the conduct described in the Information according to instructions provided by the Offices;

2.      The Company accepts the terms and conditions of this Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment

B-1

to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of this Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Northern District of Texas; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts or relating to conduct known to the Offices prior to the Effective Date of this Agreement that is not time-barred by the applicable statute of limitations on the Effective Date of this Agreement;

3.    The Senior Vice President, General Counsel of the Company, Grant B. McGee, is hereby authorized, empowered and directed, on behalf of the Company, to execute the Deferred Prosecution Agreement substantially in such form as reviewed by this Board of Directors at this meeting with such changes as the Senior Vice President, General Counsel of the Company, Grant B. McGee, may approve;

4.    The Senior Vice President, General Counsel of the Company, Grant B. McGee, is hereby authorized, empowered, and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms, or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing resolutions; and

5.    All of the actions of the Senior Vice President, General Counsel of the Company, Grant B. McGee, which actions would have been authorized by the foregoing resolutions except that such actions were taken prior to the adoption of such resolutions, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

B-2

Date: 8 | 27 | 2025                 By: _____ B. M'c_____

                                         Grant B. McGee
                                         Corporate Secretary
                                         Kimberly-Clark Corporation

ATTACHMENT C

## CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal controls, compliance code, policies, and procedures regarding compliance with respect to Section 510(k) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 360(k)) and the implementing regulations in 21 CFR Part 807, Subpart E—Premarket Notification Procedures and successor regulations ("Relevant Law"), Kimberly-Clark Corporation (the "Company"), on behalf of itself and its subsidiaries and affiliates, agrees to continue to conduct, in a manner consistent with all of its obligations under this Deferred Prosecution Agreement, appropriate reviews of its existing internal controls, compliance code, policies, and procedures.

Where necessary and appropriate, the Company agrees to adopt a new or to modify its existing compliance program with respect to the Relevant Law, including internal controls, compliance code, policies, and procedures, to ensure that it maintains an effective compliance program that is designed, implemented, and enforced to effectively deter and detect violations of the Relevant Law. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal controls, compliance code, policies, and procedures:

### *Commitment to Compliance*

1.      The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of the Relevant Law and the Company's compliance codes, policies, and procedures, and demonstrate rigorous adherence by example. The Company will also ensure that all other levels of management, in turn, reinforce those standards and encourage employees to abide by them. The Company will

C-1

create and foster a culture of ethics and compliance with the law in its day-to-day operations at all levels of the company.

### *Policies and Procedures*

2.      The Company will develop and promulgate a clearly articulated and visible corporate policy against violations of the Relevant Law, which policy shall be memorialized in a written compliance code or codes.

3.      The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of the Relevant Law and the Company's compliance code, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of the Relevant Law by personnel at all levels of the Company. These policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company, such as agents, consultants, authorized representatives, distributors, contractors, suppliers, and joint venture partners (collectively, "Agents and Business Partners"). The Company shall notify all employees that compliance with these policies and procedures is the duty of individuals at all levels of the company.

4.      The Company will ensure that it has a system of procedures, including a system of internal controls, reasonably designed to ensure compliance with the Relevant Law. This system shall be designed to provide reasonable assurances that the Company files premarket approval applications and/or premarket notifications as required by the Relevant Law.

### *Periodic Risk-Based Review*

5.      The Company will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company.

6.      The Company shall review its compliance policies and procedures designed to reduce the prospect of violations of the Relevant Law or the Company's compliance code no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field, evolving industry standards, and the risk profile of the Company, its customers, and its products.

### *Proper Oversight and Independence*

7.      The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's compliance code, policies, and procedures regarding the Relevant Law. Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of stature and autonomy from management as well as sufficient resources and authority to maintain such autonomy.

### *Training and Guidance*

8.      The Company will implement mechanisms designed to ensure that its compliance code, policies, and procedures regarding the Relevant Law are effectively communicated to all directors, officers, relevant employees, and, where necessary and appropriate, Agents and Business Partners. These mechanisms shall include: (a) periodic training for all directors and officers, all employees in positions of leadership or trust or in positions that require such training (e.g., regulatory, quality, manufacturing, research and development, sales, marketing, internal audit, legal, compliance), and, where necessary and appropriate, Agents and Business Partners; and (b) corresponding certifications by all such directors, officers, employees, and Agents and Business Partners, certifying compliance with the training requirements. The Company will conduct training

C-3

in a manner tailored to the audience's size, sophistication, or subject matter expertise and, where appropriate, will discuss prior compliance incidents.

9.      The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, Agents and Business Partners, on complying with the Company's compliance code, policies, and procedures regarding the Relevant Law, including when they need advice on an urgent basis.

### *Reporting, Investigation, and Remediation of Misconduct*

10.      The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection against retaliation of, directors, officers, employees, and, where appropriate, Agents and Business Partners concerning violations of the Relevant Law or the Company's compliance code, policies, and procedures regarding the Relevant Law.

11.      The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of the Relevant Law or the Company's compliance code, policies, and procedures regarding the Relevant Law, regardless of the route by which the Company became aware of the allegation. The Company will handle the investigations of such allegations in an effective manner, including routing reports of misconduct to appropriate personnel and conducting timely and thorough investigations to determine root causes to identify any systemic issues and/or control failures.

12.      The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct and to

prevent further similar misconduct, including assessing prior misconduct and the Company's internal controls, compliance code, policies, and procedures and making modifications necessary to ensure the overall compliance program regarding the Relevant Law is effective. The Company shall ensure that root causes, including systemic issues and control failures, and relevant remediation are shared with management as appropriate.

### *Compensation Structures and Consequence Management*

13.     The Company will implement clear mechanisms to incentivize adherence to the Relevant Law and the Company's compliance code, policies, and procedures regarding the Relevant Law by the Company's directors, officers and employees, whose responsibilities include compliance with the Relevant Law, and where appropriate, Agents and Business Partners. These incentives shall include, but not be limited to, the implementation of criteria related to compliance in the Company's compensation and bonus system.

14.     The Company will institute appropriate disciplinary procedures to address, among other things, violations of the Relevant Law and the Company's compliance code, policies, and procedures regarding the Relevant Law by the Company's directors, officers, and employees. Such procedures should be applied consistently, fairly, and in a manner commensurate with the violation, regardless of the position held by, or perceived importance of, the director, officer, or employee.

### *Third-Party Relationships*

15.     The Company will institute appropriate risk-based due diligence and compliance requirements regarding the Relevant Law that pertain to the retention and oversight of Agents and Business Partners, including:

      a.      conducting adequate due diligence with respect to the risks posed by the use of Agents and Business Partners, including their reputations and relationships, if any, with regulatory authorities and agencies;

      b.      informing Agents and Business Partners of the Company's commitment to abiding by the Relevant Law and of the Company's compliance code, policies, and procedures regarding the Relevant Law; and

      c.      seeking a reciprocal commitment from Agents and Business Partners.

The Company also will engage in ongoing risk-based monitoring of Agents and Business Partners through updated due diligence, training, audits, and/or annual compliance certifications by the third party.

16.      Where necessary and appropriate, the Company will include standard provisions in agreements, contracts, and renewals thereof with Agents and Business Partners that are reasonably calculated to prevent violations of the Relevant Law, which may, depending upon the circumstances, include: (a) undertakings relating to compliance with the Relevant Law; (b) rights to conduct audits of the facilities, documents, and records of Agents and Business Partners to ensure compliance with the foregoing; and (c) rights to terminate Agents and Business Partners as a result of any breach of the Relevant Law, the Company's compliance code, policies, or procedures, or the representations and undertakings related to such matters.

### *Mergers and Acquisitions*

17.      The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate due diligence regarding the Relevant Law by legal and compliance personnel.

18.     The Company will ensure that the Company's compliance code, policies, and procedures regarding the Relevant Law apply as quickly as is practicable to newly acquired businesses or entities merged with the Company and will promptly:

a.     train the directors, officers, employees, and Agents and Business Partners consistent with Paragraph 8 above on the Relevant Law and the Company's compliance code, policies, and procedures regarding the Relevant Law; and

b.     where warranted, conduct an audit of all newly acquired or merged businesses as quickly as practicable concerning compliance with the Relevant Law.

### *Monitoring and Testing*

19.     In order to ensure that its compliance program does not become stale, the Company will conduct periodic reviews and testing of its compliance program to evaluate and improve the program's effectiveness in preventing and detecting violations of the Relevant Law and the Company's compliance codes, policies, and procedures regarding the Relevant Law, taking into account relevant developments in the field, evolving industry standards, and the risk profile of the Company, its customers, and its products. The Company will ensure that compliance and control personnel have sufficient direct or indirect access to relevant sources of data to allow for timely and effective monitoring and/or testing.

ATTACHMENT D

## COMPLIANCE REPORTING REQUIREMENTS

Kimberly-Clark Corporation (the "Company") agrees that it will report to the United States Department of Justice, Civil Division, Consumer Protection Branch or the United States Department of Justice, Criminal Division, Fraud Section (collectively, the "Offices") periodically. The Company shall transmit copies of all work plans, reports, certifications, and other notices to the Offices as required herein in accordance with the requirements for all notices as described in Paragraph 40 of the Deferred Prosecution Agreement (the "Agreement").

During the Term of the Agreement, the Company shall review, test, and update its compliance program and internal controls, policies, and procedures regarding compliance with section 510(k) of the Federal Food, Drug, and Cometic Act (21 U.S.C. § 360(k)) and the implementing regulations in 21 CFR Part 807, Subpart E—Premarket Notification Procedures and any successor regulations ("Relevant Law") described in Attachment C. The Company shall be required to: (a) conduct a review and (b) prepare a report, as described below. Prior to conducting the review, the Company shall be required to prepare and submit a work plan for the review. The Company shall also be required to submit additional types of reports on a periodic basis, as described below. The Company shall also, if requested by the Offices during the Term, provide additional information, including documents, or meet with the Offices regarding remediation, implementation, and testing of its compliance program and the internal controls, policies, and procedures described in Attachment C.

In conducting the review, the Company shall undertake the following activities, among others, concerning compliance with the Relevant Law: (a) inspection of relevant documents, including the Company's current policies, procedures, and training materials; (b) inspection and

testing of the Company's systems, procedures, and internal controls, including record keeping and internal audit procedures; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons; and (d) analyses, studies, and, comprehensive testing of the Company's compliance program.

### *Written Work Plans, Reviews, Reports, and Certifications*

1.      The Company shall conduct a review and prepare a report.

2.      Within sixty (60) calendar days after the Effective Date of the Agreement, the Company shall, after consultation with the Offices, prepare and submit a written work plan to address the Company's review.  The Offices shall have thirty (30) calendar days after receipt of the written work plan to provide comments, which the Company shall incorporate into its written work plan.

3.      The written work plan shall identify with reasonable specificity the activities the Company plans to undertake to review and test each element of its compliance program, as described in Attachment C.

4.      Any disputes between the Company and the Offices with respect to the written work plan shall be decided by the Offices in their sole discretion.

5.      No later than twelve (12) months after the Effective Date of the Agreement, the Company shall submit to the Offices a written report setting forth: (1) a complete description of its remediation efforts to date; (2) a complete description of the testing conducted to evaluate the effectiveness of the compliance program and the results of that testing; and (3) its proposals to ensure that its compliance program is reasonably designed, implemented, and enforced so that the program is effective in deterring and detecting violations of the Relevant Law.  A certification from the Chief Executive Officer of the Company and the Chief Quality Officer of the Company,

in the form of executing the document attached as Attachment E to the Agreement, shall accompany the report. The certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of 18 U.S.C. §§ 1001 and 1519, and it will be deemed to have been made in the judicial district in which the Agreement is filed. With prior written approval of the Offices, the Company may extend the time period for issuance of the report and certification.

### *Additional Reporting Requirements*

6.      The Company shall submit written reports to the Offices concerning Reportable Events on a quarterly basis. A Reportable Event is any matter that, after a reasonable opportunity to conduct an appropriate review or investigation of the allegations, a reasonable person would consider a material violation of the Relevant Law. A Reportable Event may be the result of an isolated event or a series of occurrences. The written report shall include: (a) whether any Reportable Events have been determined to have occurred during the preceding calendar quarter, and providing updated information about Reportable Events that the Company determined to have occurred during any prior calendar quarter, as may be necessary in the reasonable determination of the Company or at the Offices' request; (b) a description of the Reportable Event, including the relevant facts, the positions of the persons involved, and the legal authorities implicated; (c) a description of the Company's actions taken to investigate and correct the Reportable Event; and (d) a description of any further steps the Company plans to take to address the Reportable Event and prevent it from recurring. The written reports shall be submitted to the Offices no later than fifteen (15) calendar days after the end of each calendar quarter (that is, by January 15 for the calendar quarter ending December 31, April 15 for the calendar quarter ending March 31, July 15 for the calendar quarter ending June 30, and October 15 for the calendar quarter ending September

30), excepting any calendar quarter that ends within thirty (30) calendar days of the end of the Term.

### *Additional Information and Meetings During the Term*

7.     Upon request of the Offices in their sole discretion, the Company shall provide to the Offices additional information or documents regarding its compliance-related improvements, processes, and controls. The Company's cooperation pursuant to this Paragraph is subject to applicable law and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Company must provide to the Offices a log of any information or cooperation that is not provided based on an assertion of law, regulation, or privilege, and the Company bears the burden of establishing the validity of any such an assertion.

8.     When the Offices deem it appropriate in their sole discretion, representatives from the Company and the Offices will meet to discuss the status of the review and reporting obligations, and any suggestions, comments, or improvements the Company may wish to discuss with or propose to the Offices.

### *Confidentiality of Submissions*

9.     Submissions by the Company, including the work plans and reports, will likely include proprietary, financial, confidential, and competitive business information. Moreover, public disclosure of the submissions could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement. For these reasons, among others, the submissions and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in writing, or except to the extent the Offices determine in their sole discretion that disclosure would be in furtherance of the Offices' discharge of their duties and responsibilities or is otherwise required by law.

D-4

ATTACHMENT E

**CERTIFICATION**

To:     United States Department of Justice
        Consumer Protection Branch
        Attention: Corporate Compliance


Re:     Deferred Prosecution Agreement Disclosure Certification


The undersigned certify pursuant to Attachment D of the Deferred Prosecution Agreement ("DPA") effective on August __, 2025, by and between the United States Department of Justice, Consumer Protection Branch and the United States Department of Justice, Criminal Division, Fraud Section (collectively, the "Offices") and Kimberly-Clark Corporation (the "Company"), that the undersigned are aware of the Company's reporting obligations under Attachment D of the DPA and have reviewed the Company's written work plan and compliance report. The undersigned further certify that to the best of the undersigned's knowledge based on a reasonable inquiry, the Company's compliance report has disclosed to the Offices all information required pursuant to Attachment D of the DPA, which includes (1) a complete description of the Company's remediation efforts to date; (2) a complete description of the testing conducted to evaluate the effectiveness of the compliance program and the results of that testing; and (3) the Company's proposals to ensure that its compliance program is reasonably designed, implemented, and enforced so that the program is effective in deterring and detecting violations of section 510(k) of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 360(k)) and the implementing regulations in 21 CFR Part 807, Subpart E—Premarket Notification Procedures and its successor regulations ("Relevant Law"). The undersigned further certify that to date, to the best of the undersigned's knowledge based on a reasonable inquiry, the Company has disclosed to the Offices all Reportable Events as required by Attachment D of the DPA.

The undersigned further acknowledge and agree that the reporting requirements contained in Attachment D of the DPA and the representations contained in this certification constitute a significant and important component of the DPA and the Offices' determination of whether the Company has satisfied its obligations under the DPA.

The undersigned hereby certify that the undersigned are the Chief Executive Officer ("CEO") and Chief Quality Officer ("CQO") of the Company and have been duly authorized by the Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Northern District of Texas. This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a

department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Northern District of Texas.

By: _____     Dated: _____
    [NAME]
    CEO
    Kimberly-Clark Corporation

By: _____     Dated: _____
    [NAME]
    CQO
    Kimberly-Clark Corporation